**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ALLSTATE INSURANCE COMPANY *as subrogee*
*of Thomas Lothridge*,

                                   Plaintiff,

                - v -                                                    Civ. No. 8:07-CV-1011
                                                                                (RFT)[1]

ALBERT GONYO,[2]

                                   Defendant.

APPEARANCES:                                        OF COUNSEL:

COZEN, O'CONNOR LAW FIRM                     DANIEL J. LUCCARO, ESQ.
*Attorney for Plaintiff*
1900 Market Street, 3rd Floor
Philadelphia, Pennsylvania 19103

OFFICE OF DANIEL W. COFFEY                   DANIEL W. COFFEY, ESQ.
*Attorney for Defendant*
119 Washington Avenue, 2nd Floor
Albany, New York 12210

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### MEMORANDUM DECISION and ORDER

        In this fire subrogation action, on September 12, 2008, Allstate Insurance Company

(Allstate) filed a Motion *in Limine* to Preclude the Expert Testimony of George Hanslmaier.  Dkt.

Nos. 39-41.[3]  Gonyo opposes Allstate's Motion *in Liminie*.  Dkt. Nos. 42 & 43.[4]  In the interim,

---

        [1] On July 25, 2008, the parties filed a Notice to Consent to the Exercise of Jurisdiction by a United States
Magistrate Judge, Dkt. No. 34, and, on July 30, 2008, the Honorable Lawrence E. Kahn, Senior United States District
Judge, referred and reassigned this case to this Court, Dkt. No. 35.

        [2] Initially, Charles Stone was listed as a Defendant as well.  On August 12, 2008, the parties filed a Stipulation
of Discontinuance as to Mr. Stone, Dkt. No. 37, which was approved by this Court, Dkt. No. 38.

        [3] Allstate's Motion *in Limine* is comprised of the following:
Dkt. No. 39              Notice of Motion
Dkt. No. 40              Daniel J. Luccaro, Esq., Aff., dated Sept. 12, 2008
Dkt. No. 41              Pl.'s Mem. of Law

                                                                        (continued...)

Gonyo filed a Motion for Summary Judgment and on April 8, 2009, this Court issued a Memorandum-Decision and Order denying Gonyo's Motion.  Dkt. No. 52.  For the reasons that follow, Allstate's Motion *in Liminie* is **denied**.

## I. BACKGROUND

The parties' familiarity with the facts are presumed.  *Id*. at pp. 2-6.  Nonetheless, a brief recitation of the facts are warranted.

On November 14, 2006, Albert Gonyo and Charles Stone rented Thomas Lothridge's cabin, which is located in the Town of New Berlin, Chenango County, as they had done on multiple occasions in the past.  Prior to pursuing hunting, Gonyo lit a fire in the wood burning stove while Stone assisted by bringing in the wood.  After the stove was lit, Gonyo and Stone left the cabin for approximately forty-five (45) minutes to scout for deer.  Upon their return to the cabin, they observed black smoke billowing from the cabin.  Later, as they looked through the cabin's windows, they could see the inside engulfed in flames.

Within eleven (11) minutes of the alarm, the New Berlin Fire Department was the first fire company to respond and on that first truck was the Fire Chief George Hanslmaier.  Other fire companies also arrived and assisted in the containment of the fire.  Chiefly among those other fire companies, was the Chenango County Fire Cause and Origin Team ("CCFCOT").  At all times during the management of the fire, Fire Chief Hanslmaier was the senior officer, and because of his superior rank, as a matter of policy, he was the fire and origin investigator.  Hanslmaier has served

---

[3](...continued)
Dkt. No. 41-2 to 41-10     Exs. A-I.

[4] Gonyo's Opposition to Allstate's Motion is comprised of the following:
Dkt. No. 42                 Daniel W. Coffey, Esq., Aff., dated Sept. 29, 2009
Dkt. No. 43                 Def.'s Mem. of Law, dated Sept. 29, 2008, with Ex. A.

his fire company for twenty-five (25) years, moved up the ranks, and has served as Fire Chief for approximately ten (10) years prior to this fire.  In addition, Hanslmaier was a Level One Certified Fire Investigator.

Once the fire was extinguished, and as the highest ranking official at the fire scene, Hanslmaier conducted a fire scene origin and cause investigation, of which Gonyo and Stone witnessed.  Based upon his observations, and after conferring with others, Hanslmaier concluded that the fire began due to the heat from the chimney which ignited the roof.  He further opined that further damage was caused by "drop down" debris from the roof.  Upon returning to his fire station, Hanslmaier typed up a report.  Dkt. No. 41-4.

Allstate retained the services of Dennis A. Ware to investigate the cause and origin of the fire, and, on November 17, 2005, Ware inspected the fire scene.  During his inspection, Ware observed the outline of the purported remains of a plastic tool chest, which was sitting approximately six (6) inches from the wood burning stove.  Based upon his investigation, Ware opined that the fire did not start in the roof line but rather in the northeast corner of the living room by the stove, attributing the ignition of the fire "to the failure of the persons who were using the wood stove to maintain proper clearance to combustibles (the plastic toolbox) located close to the wood stove[.]"  Dkt. No. 41-2 at p. 7.  Immediately thereafter, Ware reported his conclusion to Allstate and, on April 12, 2006, Gonyo received a letter advising him that the fire was the result of his negligence.

By this Motion, Allstate contends that Hanslmaier's testimony should not be admitted at trial because it would fail to comport with the standards set forth in FED. R. EVID. 702 and *Daubert v. Merrill-Dow, Pharm. Inc.*, 509 U.S. 579 (1993).  In this respect, Allstate attacks Hanslmaier's

qualifications as a cause and origin investigator and his opinions as unreliable.  As an ancillary issue, Allstate asserts that Hanslmaier's opinion is not his own but actually that of unknown members of the CCFCOT.  In support of these challenges to Hanslmaier testifying, Allstate levies a litany of objections.

Turning first to the challenges of Hanslmaier's qualifications, Allstate starts by minimizing his certification as a Level I Fire Investigator.  Allstate notes that he had not obtained a Level II Certification nor attempted to do so; he has no other certification relating to fire cause and origin investigation nor was he a member of the CCFCOT; and Hanslmaier has never been retained as an expert witness nor given a deposition or testimony in his capacity as Fire Chief or fire cause and origin investigator.

In terms of his opinion, which Allstate maintains is unreliable, its first shot over the bow is that it is not his independent opinion but a group decision.  Allstate states that Hanslmaier did not follow the National Fire Protection Association (NFPA) standards, which provide guidance for fire and explosive investigations.  In this regard, Allstate notes that Hanslmaier did not take any photographs, personally interview witnesses, particularly Gonyo and Stone, conduct a further investigation, nor test his theory as to the origin of the fire as recommended by the NFPA.  In Allstate's view, Hanslmaier's conclusion is based upon his inspection of the fire scene, which in and of itself is insufficient.  Further compounding its attack on his opinion, Allstate raises that Hanslmaier does not have an opinion regarding how the fire spread from the roof area to the other portions of the cabin.

## II. DISCUSSION

A.  The Applicable Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The statute reads

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Basically, there are two prerequisites: (1) that the witness be qualified as an expert in scientific, technical or specialized matters, *see Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997); and (2) the expert's testimony will assist the trier of the facts in understanding the evidence or determining a fact in issue, *see United States v. One Parcel of Property Located at 31-33 York Street*, 930 F.2d 139, 141 (2d Cir. 1991).   Moreover,   Rule 702 delegates to the court a "gatekeeping" function, which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"  *Daubert*, 509 U.S. at 592-93.  What is required is that the testimony must be relevant and reliable.  *Id.* at 589-91 & 597 ("[A]n expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").  This two prong inquiry applies to all scientific, technical, and specialized knowledged testimony equally.  *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).  The admissibility of the expert's testimony, that is, whether the testimony is relevant and reliable, resides with the proponent of the testimony and his burden of proof is by the preponderance of evidence.  *Boujaily v. United States*, 483 U.S. 171, 176 (1987);  *Daubert*, 509 U.S. at 592-93 n.10; *see also* Fed. R. Evid. 104(a).

As to the first prong of the gatekeeper's fundamental task, *Gen. Elec. Co. v. Joiner,* 522 U.S.

136, 142 (1997), in order to determine if expert testimony will assist the trier of fact, courts need not look any further than Rules 401 and 402 to determine if the matter is relevant.[5] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401; *Royal Ins. Co. of Am. v. Joseph Daniel Const.*, 208 F. Supp. 2d 423, 428 (S.D.N.Y. 2002) (noting that it is a "direct relationship" between an issue and the evidence). Therefore, in order for evidence or testimony to be relevant, it must relate to an issue in the case or be sufficiently pertinent to a material fact in the case. *Daubert*, 509 U.S. at 591. This relevancy consideration as been "aptly described as one of fit." *Id*. "[T]he expert's testimony will . . . fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Hackert v. First Alert, Inc*., 2005 WL 6021862, at *2 (N.D.N.Y. June 14, 2005) (citing, *inter alia*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997)) (quotation marks and alteration in original).

In assessing the reliability of a proffered expert's testimony, the Supreme Court in *Daubert* provided a list of non-exclusive factors that a trial court should consider: (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 592-95. But this is not a

---

[5] Rule 402 succinctly states that

[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

FED. R. EVID. 402.

definitive checklist of factors because the test of reliability is a flexible one.  *Kumho*, 526 U.S. at 158

(citing *Daubert*, 509 U.S. at 594); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997) (ruling that

the courts are granted broad latitude).  Since no single factor is dispositive as to reliability and not

every *Daubert* factor can be applicable to every type of expert testimony, a court can consider one

or  more of those factors, or may even considered other factors to determine reliability.  *Kumho*

*Tires*, 526 U.S. at 141.[6]  Depending on the particular case, the nature of the issues, and the particular

expert testimony being proffered, a trial court should have sufficient leeway to determine what

factors are more helpful in evaluating the reliability of the testimony.  *Id*. at 142.[7]  It is not the courts

obligation "to weigh the correctness of an expert's opinion or to choose between conflicting

opinions[.]"  *Travelers Property & Cas. Corp. v. Gen. Elec. Co.,* 150 F. Supp. 2d 360, 364 (D. Conn.

2001).  Nor must the courts "admit opinion evidence that is connected to existing data only by the

*ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146.[8]  The testimony, whether based

upon professional study or personal experience, must meet the "same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.

---

[6]  For example, the advisory committee summarizes several other factors that may be considered by the trier of the fact in determining reliability:

> (1) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their own opinions expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being careful as he would be in his regular professional work outside his paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory comm. notes (2000 Amendment)( internal citations and quotation marks omitted).

[7]  "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  FED. R. EVID. 702 advisory comm. notes (2000 Amendment).

[8]  Conversely, if courts exclude any scientific testimony, it is not an abuse of discretion unless the exclusion is "manifestly erroneous."  *Zaremba v. Gen. Motors Corp*., 360 F.3d 355, 357 (2d Cir. 2004).

B.  Qualifications

Initially, the Court must determine if Hanslmaier is qualified to testify regarding the origin of this fire.  Allstate takes a dim view of Hanslmaier's qualifications.  Allstate discounts his Level I Certificate as essentially meaningless and highlights Hanslamier's failure to obtain the Level II Certification.  Compounding that failure, Allstate posits that Hanslmaier has no other certification relating to fire cause and origin investigation, has never testified in a deposition or trial in his capacity as Fire Chief, and has never been retained as an expert witness.

Hanslmaier has more than twenty-five (25) years experience as a volunteer fireman and has advanced through the ranks to become the Fire Chief for New Berlin.  Dkt. No. 41-5, Hanslmaier Dep. at p. 9.  As the Fire Chief for more than a decade, and not disregarding his duties and responsibilities in his other ranking positions, on the approximately sixteen (16) fires a year that New Berlin may have attended to, he was the most likely officer, by virtue of rank, to be assigned as the cause and origin investigator.  *Id*. at pp. 11 & 55.  He is also laboring under the belief that New York State requires the fire chief to determine the cause and origin, while the New Berlin Fire Deparatment's policy allows the top three ranking officers to lead the cause and origin team.  *Id*. at p. 48. He was certified by New York State as a fire investigator (Level I) after attending the fire academy in Montour Falls, New York.  *Id*. at p. 10.  In order to qualify for a Level I Certificate, Hanslmaier was required to attend classes and perform thirty (30) hours of fire cause and origin determination.  *Id*. at p. 10; N.Y. Comp. Codes R. & Regs. tit. 19 § 426.8(b).[9]  After securing his Level I Certificate, Hanslmaier attended other fire seminars.

---

[9] A Level II Certificate requires an additional fifty (50) hours of fire investigation activity.  N.Y. Comp. Codes R. & Regs. tit. 19 § 428(c).

While Allstate may discount Hanslmaier's credentials, and we further note the patently obvious preeminence of a Level II certified fire investigator over a Level I,  Allstate has not cited nor has this Court found any authority that supports the proposition that Level I certified officers are not competent to serve as a fire cause and origin investigator or as an expert.  Further, the Court will not ignore that Hanslmaier's expertise is derived by studying general cause and origin investigation principles, remaining familiar with them, and by his practical experience.  Rule 702 expressly contemplates that an expert may be qualified on the basis of experience alone.  FED. R. EVID. 702. Moreover, Hanslmaier has conducted  investigations for his employer, New York Central Mutual Insurance Company, where he is employed as senior property examiner.  Some of his examinations include fire damage.  Hanslmaier's Dep. at p. 56.  Weighing this record, the Court finds that Hanslmaier meets the qualifications threshold.  However, Hanslmaier must also demonstrate how his personal experience accompanied by his Level I Certificate sufficiently lead to the conclusion he has reached regarding the fire's origin.

C.  Relevance and Reliability

Simply put, it is incontrovertible that Hanslmaier's opinion as to the origin of this fire is relevant to this case, so the Court now turns to the element of reliability.

It is Allstate's position that Hanslmaier's opinion that the fire started in the roof line of the cabin is unreliable for several reasons: (1) such opinion is not his but rather the product of a group decision; and (2)  he did not follow the National Fire Protection Association (NFPA) standards.  In this regard,  Hanslmaier did not take any photographs, conduct personal interviews of witnesses, conduct any further investigation, nor test his theory as to the origin of the fire;  (3) he did not eliminate other possible origins for this fire and has no opinion as to how the fire spread from the

-9-

roof area to the other portions of the cabin; and (4) his opinion appears to be contrary to Gonyo's observations.  Not surprisingly, Gonyo gainsays each of these contentions.

Hanslamier is familiar with the NFPA standards, which were provided to him when attending the fire academy and a copy is available in the New Berlin Fire House, and he further testified at his deposition that he conducted his investigation in accordance with the guidelines.  Hanslmaier Dep. at p. 32.  He notes that NFPA requires an investigator to commence the investigation from the outside of the structure and then work towards the inside - going from the least burned area to the most burned area.  *Id*. at p. 33.  As his fire company arrived at the scene, Hanslamier observed flames on the eaves of the roof.  *Id*. at p. 21.  After the fire was extinguished, Hanslmaier, following NFPA's requirement, conducted his inspection of the cabin.  He started on the outside of the cabin and did a three hundred and sixty degree inspection of the exterior before venturing into the interior.  When inside, he performed another three hundred and sixty degree inspection.  *Id*. at p. 23.   He looked at the burned patterns and how the fire spread.  *Id*. at p. 24.  In his view, most of the damage was high up on the roof, rather than lower in the structure.  If it had been lower, he opined that there would have been the classic V pattern, and there wasn't.  *Id*. at pp. 25 & 29.   Based upon his inspection and his reliance on "char, the burns patterns, the amount of fire damage and how the fire spread," he concluded that the fire was ignited by the stove pipes that lead into the roof.  *Id*. at p. 24.  He opined that the "chimney [was] getting too hot and causing [sic] the framing around it to ignite." *Id*. at p. 35.  As he inspected the cabin, he saw a hole in the roof which indicated to him that  "the hottest amount of heat was in [that] area."  *Id*.  For him, there was neither multiple points of origin nor visible signs of an accelerant.  *Id*. at 31.  In terms of the stove, Hanslmaier does not recall seeing any burnt plastic nearby.  *Id.* at p. 49.

*-10-*

Allstate raises that when Gonyo and Stone returned to the cabin and observed the conflagration, Gonyo only saw flames in the interior of the cabin.  Dkt. No. 41-8, Gonyo's Dep. at p. 29-30.  If this was so, that the first persons arriving at the scene did not see flames emanating from the roof, Allstate opines that the fire could not have started in the roof, as Hanslmaier concludes.  But Hanslmaier further opines that it is possible to have seen the flames inside the cabin first before the inferno was visible from the roof.  As he noted, there could have been interior flames on the interior ceiling or even the roof's insulation prior to the flames breaking through the metal roofing, and because of the interior flames on the ceiling, there could have been "drop down" that could have ignited other furniture or items.  Hamslmaier's Dep. at pp. 51-53 & 62.  In this respect, Hanslmaier posits that "drop down" could have caused a "secondary V pattern."  *Id*. at p. 63.  Therefore, in Hanslmaier's view, it would have been reasonable to see flames in the interior first before it burned a hole through the metal roof, and this would support a theory on how the fire could have spread.

Witnesses to the fire were interviewed.  It appears that either Hanslmaier spoke with "the two occupants" or someone else on his team did.  *Id*. at pp. 30 & 46.  However, no notes were taken of those interviews.  *Id*. at p. 30.  He also admitted that he did not take any pictures of his investigation nor draft any diagrams.  *Id*. at p. 45.  Even though others may have assisted Hanslmaier on his overall assessment and participated in the decision as to the origin of the fire, he was responsible for typing up the report and is its sole author.  *Id*. at p. 38 & 46.

"NFPA 921," Dkt. No. 41-10, is a peer review and is generally accepted in the fire community.  *Royal Ins. Co. of Am. v. Joseph Daniel Const*., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002).  NFPA 921's goal is to provide guidance to the investigators which is based upon accepted scientific principles.  Dkt. No. 41-10 at p. 1.  Chapter Four outlines a basic scientific methodology,

a systematic approach to investigating fires.  "With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together."  *Id*. at p. 2.  Such investigation requires an examination of the scene, interviewing witnesses, and testing the results.  The empirical data collected, which is "based on observation or experience and is capable of being verified," is subject to an analysis premised upon inductive reasoning.  *Id*.[10]

This Court has considered Hanslmaier's background and practical experience in acting as a cause and origin investigator.  The record indicates that he has specialized knowledge through experience and training in order to render an opinion as to the origin of this fire.  His opinion meets both the *Daubert* "fit" requirement and its threshold.  Hanslmaier has demonstrated that his opinion is the product of the intellectual rigor demanded of a fire investigator and that he relied upon a proven methodology and principles.  He has provided reasonable grounds for his conclusion that may assist the trier of fact to shift through the events of the fire.  Although Hanslmaier may not have ardently and strictly followed each step of NFPA, these shortcomings will not be fatal to him testifying before the jury and having his opinion tested.  He used an individually tailored investigative process which was basically consistent with NFPA.  If there is any question that Hanslmaier did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack. *Royal Ins. Co. of Am. v. Joseph Daniel Const*., 208 F. Supp. 2d at 427-28; *Manoma Realty Mgmt.*

---

[10]  The NFPA 921 is broken into subparagraphs that outline a six step process in which an investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis.  Dkt. No. 41-10 at p. 2.

*LLC v. Fed. Pacific Elec. Co.*, 2007 WL 2175947, at *4 (S.D.N.Y. July 27, 2007) (noting that the question of credibility should not keep an expert testimony from being admitted).  The same may hold true regarding the failure to take pictures and personally interview key witnesses, or his consideration of the opinions of others as to how the fire began.  Indeed, the "Federal Rules of Evidence specifically provide that an expert may rely on facts or data perceived by *or* made known to the expert . . . . [Thus,] [t]he expert need not conduct her own tests." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (internal quotation marks and citations omitted) (emphasis in original); *Manoma Realty Mgmt. LLC v. Fed. Pacific Elec. Co.*, 2007 WL 2175947, at *6 (finding that Rule 703 does not preclude expert testimony simply because the expert has not personally been at the scene).  Expert testimony should not be precluded just because the expert assumed facts not in evidence or did not interview a witness. *Daubert*, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation."); *Seeley v. Hamilton Beach/Proctor-Silex, Inc.*, 349 F. Supp. 2d 381, 387 (N.D.N.Y. 2004).  What is critical is that Hanslmaier's theory is capable of being tested, *Travelers Property & Cas. Corp v. Gen. Elec. Co.*, 150 F. Supp. 2d at 366, and that test can occur within the crucible of cross examination.

Now, these conclusions do not mean that Hanslmaier's opinions cannot be challenged by vigorous cross examination, the presentation of a contrary view of the fire scene and the fire's origin, and proper jury instructions. *Daubert*, 509 U.S. at 595.  "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Travelers Property & Cas. Corp v. Gen. Elec. Co.*, 150 F. Supp. 2d at 366 (citation omitted).  A court's task is not supposed to decide the correctness of an expert's opinion nor choose between competing opinions.  A court's scope of

review is narrowly tailored as to whether the expert's opinion meets the *Daubert* threshold - is the testimony relevant and reliable.  In actuality, most, if not all, of Allstate's objections go to the weight and not the admissibility of the proposed expert testimony.  All of the areas of contention raised by Allstate, and there are many, are substantial and fertile and yet more appropriately and better suited to be scrutinized through the heat of the adversary system rather than for the Court to assume that function.  *Ambrosini v. Labarraque*, 101 F.3d 129, 133-35 (D.C. Cir. 1996); *Travelers Property & Cas. Corp v. Gen. Elec. Co.*, 150 F. Supp. 2d at 366 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (citation omitted).

The Court is satisfied that Gonyo has met his burden insofar as Hanslmaier's opinion meets the *Daubert/Kumho* standards.  There are sufficient facts and data to support the opinion.  Hanslmaier has applied NFPA 921, a reliable and acceptable methodology, albeit not completely.  His testimony is the product of reliable principles and methods.  Hence Hanslmaier will be permitted to offer his opinion as to the cause and origin of the cabin's fire, subject, of course, to cross examination.  Accordingly, Allstate's Motion to Preclude Expert Testimony, Dkt. Nos. 39-41, is **DENIED**.

**IT IS SO ORDERED**.

April 29, 2009
Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge